9413

FASS v. ATLANTIC LIFE INS. CO.

(89 S. E. 558.)

1. INSURANCE—AGENTS—RENEWAL COMMISSIONS—CONTRACT—CONSTRUCTION.—Contract of insurance agency construed, and *held* to entitle agent to renewal commissions only during the continuance of his employment by the insurance company.

2. INSURANCE—AGENCY CONTRACTS—DETERMINATION AT WILL.—A life insurance agency contract which fixes no date or time for its duration, and in which the agent has no coupled interest in the subject matter is determinable at will, regardless of the agent's understanding to the contrary.

3. PRINCIPAL AND AGENT—CONTRACT OF AGENCY—DETERMINATION AT WILL.—An agent's employment to do a particular work may be terminated at any time at the will of the principal.

4. INSURANCE—AGENCY CONTRACTS—RENEWAL COMMISSIONS.—Under an insurance agency contract expressly providing that agent's right to

renewal commissions should continue only while he remained in the employment of his principal, such agent had no coupled interest in the agency such as would prevent the principal from revoking his authority at will.

5. CONTRACTS—CONSTRUCTION OF WRITTEN CONTRACTS—CONDUCT OF THE PARTIES.—Only where a written contract is equivocal or ambiguous can the rights of the parties thereunder be determined by the conduct or construction by the parties to such contract.

6. CONTRACTS—SUBSEQUENT MODIFICATION OF SUBSEQUENT CONTRACT.—A written contract may be subsequently modified by agreement of the parties.

7. INSURANCE—AGENCY—RENEWAL COMMISSIONS—RECOVERY BY AGENT AFTER TERMINATION OF HIS EMPLOYMENT.—Where insurance company induced agent to remain in its employment by representations that his renewal commissions would support him and his family in their old age, *held* the written contract of agency was so modified as to entitle the agent to renewal commissions after revocation of his agency without cause.

Before RICE, J., Dillon, March, 1915.     Affirmed.

Action by Max Fass against the South Atlantic Life Insurance Company. Judgment for plaintiff, and defendant appeals.

The following is the exhibit referred to in the opinion:

Exhibit 1. This agreement, made this 7th day of November, in the year one thousand nine hundred and five, between the South Atlantic Life Insurance Company, hereinafter called the "Company," and Max Fass, of Dillon, in the county of Marion and State of South Carolina, hereinafter called the "General Agent," witnesseth: That said parties, in consideration of the mutual covenants and agreements hereinafter mentioned, hereby covenant and agree each with the other, as follows, to wit: That the company do hereby appoint Max Fass as general agent of the company, with title of general agent, for the purpose of canvassing for applications for insurance on the lives of individuals, secur-

FOOTNOTE.—As to the right of one employed on commission to recover for loss of profits where employment is unlawfully terminated, see notes in L. R. A. 1916b, 872, 35 L. R. A. (N. S.) 153.

ing, appointing and developing agents, and of performing such other duties in connection therewith as may be required by the officers of said company and that this appointment is made on the following terms and conditions:

(1) The general agent shall have no authority on behalf of the company to make, alter or discharge any contract, except contracts with agents (which must be made on forms furnished and approved by the company) to waive forfeitures or conditions of policies, to extend the time of payment of any premium, or to waive payment in cash. It is further agreed that the general agent shall have no authority on behalf of the company to receive any money due or to become due to said company, except on applications obtained by or through him in exchange for conditional receipts to be furnished by the company, or on policies or renewal receipts (signed by the president, a vice president, a second vice president, secretary or treasurer) sent to him for collection.

(2) The general agent shall act exclusively as general agent for the company, and as such general agent shall devote his entire time, talents and energies to the business of the agency hereby established, and in the conducting of it shall be governed strictly by this contract and the book of "Instructions to Agents," issued from time to time by the company, and by such other instructions as he may receive from the company. All applications for insurance taken by the general agent or his subordinate agents, shall be delivered to the company, whether the same have been reported on favorably or unfavorably by the medical examiner.

(3) The general agent shall keep regular and accurate statements of all transactions for account of the company, whether conducted by him personally, or his subordinate agents, and whenever required by the company, or its authorized representatives, shall transmit to the company a report in detail, embracing every item of business done by or

through him, and of all moneys collected or received by or through him, for said company.

(4) All books of account, documents, vouchers and other books or papers connected with the business of said general agency, shall be the property of the company, whether paid for by the company or not, and at any and all times shall be open to the company or its representative, for the purpose of examination, and shall be turned over to the company or its representative on the order of the company, or on termination of said agency.

(5) All moneys or securities received or collected by the general agent for or on behalf of said company shall be securely held by him as fiduciary trust, and shall be used by him for no personal or other purpose whatever, but shall be by him immediately paid over to said company, in accordance with its instructions; and it is expressly stipulated and agreed between the parties hereto, that in case said general agent shall withhold any funds, policies or receipts belonging to said company, after such funds, policies or receipts should have been reported upon and transmitted to said company, or if he shall withhold any funds, policies or receipts after they shall have been demanded from him in writing by said company, such dereliction shall work a forfeiture to said company, unconditionally, of all claims whatsoever, accrued or to accrue under this or any previous agreement to said general agent, but nothing herein shall be construed to affect any claim of said company on said general agent.

(6) The district within which said general agent shall have permission to operate, is the counties of Marion, Florence, Horry, Georgetown, Williamsburg, jurisdiction not exclusive, such as may be mutually agreed upon from time to time, which territory may be increased or diminished at the pleasure of the company.

(7) Said general agent shall thoroughly and ably canvass said above named district; and such territory as may be from time to time assigned to him by the company.

(8) If in any case said company shall deem it proper in consequence of misrepresentation made, or misunderstandings had, at the time of the issue of a policy, to return the premiums thereon and cancel it, said general agent shall lose all right to commissions for premiums under said policy, and shall be bound to repay to said company on demand, the amount of commissions received on premiums so returned.

(9) The said general agent shall collect and promptly remit to said company all premiums on policies not issued through his instrumentality, renewal receipts for which may be furnished him from time to time by the company.

(10) It is agreed that the necessary expenses for medical examination (except as provided in section 17th hereof), and for the expressage on documents and other things sent by the company to the general agent shall be paid by the company; that the company shall furnish to the general agent such a supply of blanks and circulars as it shall deem reasonable, to enable him to carry on the business of his agency, as aforesaid; and the company shall be liable to pay no charge other than as herein stated, or as shall hereafter be allowed by special written permission of the company.

(11) The company may offset against any claim for commissions under this agreement, any debt or debts due at any time by the general agent to the company.

(12) The general agent shall not enter the service of any life insurance company or organization other than the company, or place any applications for insurance in any other life insurance company or organization, without the consent in writing of the company, so long as there is any indebtedness of any nature whatever due to the company.

(13) The ledger account of said party of the first part shall be competent and conclusive evidence of the state of the accounts between the parties hereto. Said company

agrees to furnish to said general agent a copy of said account (not oftener, however, than once a month), upon receipt of written request to that effect from said general agent, due allowance to be made for clerical delays.

(14) The general agent shall keep deposited with said party of the first part a bond for the faithful performance of this agreement, and of all duties pertaining to said agency, which said bond shall be for an amount and with security, satisfactory to said company.

(15) When premiums on policies of insurance effected with said company by or through said general agent are collected otherwise than by said general agent, 2 per cent. of such premiums shall be deducted from the commission to be allowed herein, for expense of collection. Commissions on premiums on all classes of policies not named in section 20th shall be determined by said company.

(16) In case a policy issued as applied for, shall be subsequently returned by the general agent as "not taken," the general agent shall pay to the company such sum of money as shall cover the expense of issuing such policy.

(17) No rights of said general agent under this agreement shall be sold or assigned by him without the consent of the company in writing.

(18) It is expressly understood and agreed between the parties to this agreement, that the same shall be considered strictly confidential, and that under no circumstances shall said general agent mention or exhibit the terms thereof to any person or persons, under penalty of forfeiture of the same and of all benefits hereunder.

(19) It is agreed that said general agent shall be allowed, under this agreement, the following compensation only, unless otherwise expressly stipulated in writing, namely: A commission on the original cash premium for the first year of insurance, which shall, during his continuance as said agent of said company, and only in this event, be obtained, collected, paid to and received by said company, on policies

of insurance effected with said company, by or through said general agent, which commission shall be at and after the following rates:

A. On the original cash premium for the first year of insurance on accumulation business with 15, 20, 25 or 30 years accumulation periods, issued at ages 60 and under.

A. Ordinary life.............................60 per cent.
B. Twenty-payment life.....................60 per cent.
C. Fifteen-payment life.....................55 per cent.
D. Ten-payment life.......................40 per cent.
E. Endowments, paid by 20 or more annual
    premiums ..........................60 per cent.
F. Endowments, paid by 15 annual premiums..50 per cent.
G. Endowments, paid by 10 annual premiums..40 per cent.
Premium endowment ........................60 per cent.
Nonparticipating ordinary life...............50 per cent.
Nonparticipating 20-payment life.............50 per cent.
    and 20 year end.....................50 per cent.
Nonparticipating 15-payment life............40 per cent.
    and 15 year end....................40 per cent.
Nonparticipating 10-payment life and 10 year
    end .............................35 per cent.
Adjusted indemnity ........................50 per cent.
Annual dividend ..........................50 per cent.

It is agreed that in addition to the first year's commission above specified, the company will pay to the general agent renewal commission on all premiums collected on policies and paid in cash to the company, written through or by his agency, in accordance with this agreement, as follows:

O. L. 20-Yr. distribution period $7\frac{1}{2}$ per cent. for 19 years.

O. L. 15-Yr. accumulation period $7\frac{1}{2}$ for 14 years.

20 P. L. $7\frac{1}{2}$ for 19 years.

15 P. L. $7\frac{1}{2}$ for 14 years.

10 P. L. $7\frac{1}{2}$ for 9 years.

Endowment paid by 20 or more annual premiums 7½ for 19 years.

Endowment paid by 15 annual premiums 7½ for 14 years.

Endowment paid by 10 annual premiums 7½ for 9 years.

Premium endowment 7½ for 19 years.

Nonparticipating ordinary life 7½ for 10 years.

Nonparticipating 20 payment life 7½ for 10 years, and 20 yr. end. 7½ for 10 years.

Nonparticipating 15 payment life and 15 yr. end. 7½ for 7 years.

Nonparticipating 10 payment life and 10 yr. end. 7½ for 5 years.

Adjusted indemnity 7½ for 10 years.

Annual dividend 7½ for 10 years.

These renewal commissions to continue for the above specified periods, respectively, provided the general agent remains in the service of the company for the entire period so specified, but in no event to continue beyond the period of such service except as herein expressly provided.

It is further agreed that in event of the death of the general agent while in the service of the company, the above renewal commission will be paid by the company to the administrators, executors, or assigns of the general agent, less 2 per cent. collection fee, for a period of five years on policies on which premiums are paid during that time, unless sooner terminated by the renewal limitations above named.

B. On all forms of insurance and at all ages not included in subdivision "A" hereof, the compensation shall be such a commission as the said company shall allow said general agent in each specific case.

In witness whereof, the parties to this agreement have hereby subscribed the same and affixed their seals the day and year first above written.    South Atlantic Life Insurance Company, by W. Fletcher Keen, Vice Pres., Max Fass.

*Messrs. Gibson & Muller* and *Willcox & Willcox,* for appellant, cite: *As to contract being determinable at will:* 87 S. C. 572, 70 S. E. 296, 34 L. R. A. (N. S.) 542. *Parol evidence varying contract:* 27 S. C. 376, 3 S. E. 776, 13 Am. St. Rep. 645; 83 S. C. 206, 65 S. E. 272; 91 S. C. 320, 74 S. E. 652; 84 S. C. 410, 66 S. E. 417; 94 S. C. 237, 77 S. E. 929; 85 S. C. 493; 67 S. E. 738. *Power of agency coupled with an interest:* 8 Wheat. 174, 5 L. Ed. 589; 2 Speers 440, 42 Am. Dec. 382; 91 N. C. 69, 49 Am. Rep. 637; 87 Fed. 167, 30 C. C. A. 593; 168 Fed. 496, 93 C. C. A. 652; 141 U. S. 627, 12 Sup. Ct. 94, 35 L. Ed. 882; 119 N. C. 187, 25 S. E. 957; 10 Wall. 589, 19 L. Ed. 1038; 58 Fed. 843; 46 Pa. 426, 431, 432; 91 N. C. 69, 49 Am. Rep. 637; 72 Tex. 70, 10 S. W. 99, 13 Am. St. Rep. 758; 124 Fed. 246; 77 Miss. 327, 28 South. 954, 78 Am. St. Rep. 522; 129 N. C. 403, 40 S. E. 119; 61 Minn. 330, 63 N. W. 740.

*Messrs. Stevenson & Prince, J. W. Johnson* and *J. P. Lane,* for respondent, distinguish 87 S. C. 527, 70 S. E. 296, 34 L. R. A. (N. S.) 542; and cite: 173 U. S. 1, 19 Sup. Ct. 335, 43 L. Ed. 594; 167 Mass. 544, 547, 46 N. E. 117, 35 L. R. A. 512, 57 Am. St. Rep. 488; 108 N. Y. 288, 15 N. E. 391; 6 Ind. App. 109, 32 N. E. 802, 51 Am. St. Rep. 289; 47 Neb. 409, 66 N. W. 536; 60 Minn. 330, 62 N. W. 392; *as to construction of contract. As to construction by parties:* 100 S. C. 1, 84 S. E. 112; distinguish 50 S. C. 511, 27 S. E. 920; 119 N. C. 187, 25 S. E. 956; 91 N. C. 69, 49 Am. Rep. 637; 87 Fed. 167, 30 C. C. A. 593; 141 U. S. 627, 12 Sup. Ct. 94, 35 L. Ed. 882; 124 Fed. 246; 58 Fed. 843; 91 N. C. 69, 49 Am. Rep. 637; 61 Me. 359; and cite Mechem Agency, secs. 204, 614, 620; Clark Agency, sec. 158; 51 Conn. 310, 50 Am. Rep. 21; 51 Fed. 725; 10 App. Div. 85, 41 N. Y. Supp. 680; 21 Utah 306, 61 Pac. 21; 58 Md. 250; 104 N. C. 38, 10 S. E. 83.

June 30, 1916.

The opinion of the Court was delivered by MR. JUSTICE GAGE.

The action is for $30,000 damages for a breach by the defendant of a written contract betwixt the parties. The jury found for the plaintiff $3,200.

The contract was made November 7, 1905; the plaintiff served under it until February 7, 1913, on which day the defendant advised the plaintiff that the contract was then "terminated." By the contract the plaintiff became the defendant's "general agent" in five counties of the State "for the purpose of canvassing for applications for insurance on the lives of individuals, securing, appointing, and developing agents, and of performing such other duties in connection therewith as may be required by the officers of said company." Let the contract be reported.

There was testimony on both sides. The defendant asked for the direction of a verdict, but the motion was refused.

Two allied and conglomerate issues are made by the appeal, to wit:

"(a) That the contract offered in evidence and on which plaintiff based this suit was a contract at will and therefore determinable at will, and according to its expressed terms the renewal commissions under it were to cease upon the determination of the contract, which, being true, the company had a legal, as well as a moral, right to discharge plaintiff at will and without incurring any damages thereby.

"(b) Because there being no time stipulated in the contract during which same was to run, under the law it was conclusively presumed to be a contract at will, and the plaintiff's agency being one not coupled with an interest the defendant had the legal right and equitable right at any time to discharge him at a will."

So that there are three apparent issues: (1) Was the plaintiff's agency without couplement to an interest? · (2) If there was no such couplement, was the plaintiff therefore subject to discharge at any time? (3) Were the renewal commissions, by the express terms of the contract, to cease at its determination? The appellant asserts the affirmative of these issues. We shall not consider them in order, but we hope fully.

1. The contract is voluminous, and we assume is a standard one and was prepared by the insurance company. The following are the meager facts disclosed by the contract and by the service under it, which is the testimony:

The contract fixed a day for the commencement of the agency; it fixed by words no day, no cause, and no procedure for the termination of the agency. The plaintiff served under the contract for eight years, and betwixt him and the president there was in that time much friendly correspondence, hereinafter referred to. The contract was betwixt the plaintiff and the South Atlantic Life Insurance Company, and the service was for that company. About the end of the service, that is, in October, 1912, the South Atlantic and the American National Life Insurance Company were merged, and the child of the union was the defendant here. It does not appear if the plaintiff knew of or was consulted about the setting him to service with a new principal. But within four or five months after the union, that is, on February 7, 1913, the first vice president of the new company advised the plaintiff that his contract with the South Atlantic "is hereby terminated from and after this date." The plaintiff asked for an explanation of the letter, and the record does not show that any was given. Nor does the record disclose any good reason in the jury's view for this summary discharge of the plaintiff; and the argument at bar after the verdict suggests none, except the exercise of an arbitrary right by the defendant. Of the 19 articles of it, only the seventeenth, eighteenth, and nine-

teenth, and chiefly the nineteenth, are relevant to the issue here made, which is concretely the plaintiff's right after his dismissal to have "renewal commissions" out of the renewal premiums to be paid by policyholders in the years to follow the first year of the life of the policy.

2. The words of the contract make no provisions about an arbitrary time for its termination, nor about any cause for its termination, by either party to it; thereabout it is silent. We shall focus attention upon this contract and none other now.

There are four distinct paragraphs in the nineteenth article, though not so indicated. The first has reference only to "commissions on the original cash premium for the first year of insurance." The provision there is expressly that a commission on such premium shall only be paid to the agent during his continuance as agent. Manifestly the agent could not receive the cash premium, unless he was at the time in continued service. Then followed a separate and second paragraph; it provided for compensation "in addition to the first year's commission above specified." That paragraph has reference to "renewal commissions;" that is, commissions on renewal premiums paid by the insured from year to year.

The third paragraph of the article declares how long the "renewal commissions" shall continue to be paid; that is, for the varying periods before specified in paragraph 2. Then there follows immediately in the same paragraph these words:

"Provided, the general agent remains in the service of the company for the entire period so specified, but in no event to continue beyond the period of such service, except as herein expressly provided."

And the next or fourth paragraph recites the exception, which is not relevant. The above quoted words of the third paragraph are those relied upon by the appellant to indicate that the parties expressly agreed that a living agent should

not receive renewal commissions unless he shall remain in the service of the company.

If the contract had provided that the renewal commissions shall cease (1) when the agent quit service of his own will, or (2) when he should be discharged by the company for good cause, or (3) when he should be discharged by the company without cause and at the company's will, then there would be an end of it; the agent's renewal commissions would be gone. We think the words found in the contract necessarily mean the same thing as those of the supposed case.

The controverted words of the third paragraph plainly stipulate that the agent shall not have renewal commissions beyond the period of his service. The words do not stipulate how and why his service may be terminated. The jury has in effect found that they were terminated simply at the will of the company and without cause.

But if the law provided for such a termination at will of such an agency, then the law is read into the contract; and whether the agent knew that was the law or not, he is bound by it.

We think the plaintiff was a mere agent, and the law is plain that a principal may discharge at the principal's will an agent set to do a particular piece of work. There is an exception, long ago noted and discussed by Chief Justice Marshall in *Hunt* v. *Rousmanier,* 8 Wheat. 174, 5 L. Ed. 589.

But in the instant case the plaintiff had no coupled interest in the agency, for the reason that he expressly agreed that in the event of his not remaining in the service, he should have no renewal commission; that is, no interest at all.

3. It was suggested by the Circuit Court that the parties might be held by their own construction of the contract,

different from the words of it.   But that is only so where the written contract is equivocal; and in the instant case the written contract is not uncertain. *Philadelphia* v. *Trimble,* 10 Wall. 367, 19 L. Ed. 948.

4. If the plaintiff, therefore, must stand on the written contract alone, his renewal premiums are gone, and he has no cause of action.   The weight of the authority is that way; we shall not cite or discuss the cases; they have been cited in the briefs, and will be reported.   But the plaintiff's remedy is not thereby gone; the eighth paragraph of the complaint alleges facts which the letters of the company to the plaintiff have proven to be true, and which save the plaintiff's cause of action.

Parties to a written contract, after it has been executed and entered upon, may modify it.   There is no need to cite authority for that postulate; the words of Lord Drenman thereabout, as quoted by Wigmore, vol. IV, p. 3442, are sufficient.

The written contract was made November 7, 1905; it was terminated February 7, 1913.   The president of the company wrote to the plaintiff six letters, dated, respectively, May 21, 1906, June 7, 1906, November 10, 1908, January 18, 1911, January 31, 1911, and September 9, 1911.

In the first the writer told the plaintiff he had "special talent in the business," and "if you stick to it your renewal commissions will pay you a handsome income."   In the second letter the writer said:

"I sincerely hope that you will very soon see your way clear to announcing your decision to remain with the South Atlantic.   If I could just make you see as plainly as I do the value of your contract with us I do not believe you could be tempted to give it up."

The writer also said:

"You can in two or three years' good work build up under your contract with us, renewal commissions that will be worth several thousand dollars."

In November, 1908, the plaintiff was contemplating employment with another company. The defendant wrote the plaintiff in the third letter, and in it said:

"It is a great pity that life insurance companies will not let alone the good agents of other companies. This is the chief cause why writing life insurance has been so little profitable to most agents. They had been induced by the extraordinary offers of first one company and then another to change their allegiance, and in this way sacrifice all renewal interest for years of hard work."

In the same letter the writer said:

"Of course, you must decide, as to your trip to Columbia. I cannot see, however, that it would result in anything but possible dissatisfaction, and you might, in a moment of overwrought enthusiasm, be induced to make a change of contract; and this you certainly cannot afford to do, and sacrifice three years of hard work."

In the fourth letter the defendant wrote:

"You have the best contract of any agent on our books— one which would pay you better profits than any life insurance agent in the South today, if you would only take advantage of it by getting out the maximum production of business."

In the same letter was this:

"With the handsome nucleus of business you now have in force, if you can add from $300,000 to $500,000 a year for the next five years, your renewal interest would guarantee you and your wife a competency for old age. This is a prize worth striving for, and I hope you will make up your mind that in 1911 you will discard all distracting enterprises and vocations, and devote yourself, absolutely (as is required by your contract), to the production of business and the development of your agency."

In the fifth letter the defendant wrote:

"I am extremely gratified to hear you express the purpose of writing half a millon of business for the company this

year in your territory. It is just as important for you—
and probably more important—to see that as little of the
business that you have previously written lapses, as it is to
write new business. I want you to bear this in mind as the
one thing that you will give special attention to during the
year. You ought to have a record of all your policyhold-
ers, and the date of the maturity of their policies, and try to
see as many of them as you can, just before the next pre-
mium is due, and urge upon them the importance of paying
this, and keeping up their protection, and preserving the
equity in the premiums they have already paid. There is
absolutely no way to do this, except by a personal interview
with such policyholders as may have become dissatisfied
from one reason to another. * * * It's your renewal inter-
ests upon which you must depend for an ample competency
for yourself and wife, as you grow older, and you can only
secure this by fighting lapses every day in the year."

In the last and sixth letter were these passages:

"It seems, however, that the South Atlantic has gotten to
a point where it can get along very well without any presi-
dent, as our business is the largest in the history of the com-
pany, and we have been making more rapid and substantial
progress than ever before. From our own State, especially,
have we received most remarkable evidence and preference
of business. * * * The last time I wrote you, it was for the
purpose of seeing if I could wake you up and get you up to
your old standard of efficiency. You have a fine nucleus of
business, which will pay you renewals, but it is not enough
yet to furnish you a competency for your old age. If I
could just stimulate your energies along this line and make
you fully realize that if you will just bend your energies on
increasing your volume of business for the purpose of get-
ting a regular annual income out of your renewals for the
balance of your life, I believe you will accomplish more than
you have ever done."

These letters prove that the plaintiff wanted to terminate the agency the year after it was constituted, and the company dissuaded him from it upon representations of what it would yield him, different from the words of the written contract; that in 1908 the plaintiff was considering a change of companies, and the defendant advised him not to do so; that in 1911 the defendant wrote the plaintiff he had the best contract of any agent on the books and that his renewal commissions would guarantee to him and his wife a competency for old age.

The company by its own present interpretation of the contract did not expect the plaintiff to remain with it until his old age; nor did it expect the wife to enjoy the renewal commissions after the husband was dead. Yet this letter plainly implies that when the husband was old and unable to remain, he and his wife, together or singly by plain inference, would enjoy these renewal commissions.

The letter of January 31, 1911, repeated the same assurance. On September 9, 1911, the plaintiff was told the South Atlantic had reached so high a point of excellence that it could dispense with a president. And in the same letter its president wrote the plaintiff that he had a fine nucleus of business which will pay renewals, but it is not enough yet to furnish a competency for old age; and the writer wanted to stimulate the plaintiff to bend his energies on increasing the business to get an annual income out of renewals for the balance of the plaintiff's life.

The plain and only inference was that there would come a time, but not "yet," when the renewal commissions would support old age. There were no suggestions that to get them the plaintiff in his old age must remain in the company's service.

The express representation was that the renewal commissions would support the plaintiff until his death. That sug-

gestion was hostile to the defendant's present contention that when actual service was ended renewal commissions were also ended. To allow the company now to insist upon the words of the written contract would be to sanction a patent fraud.

We quote the words of Johnson, J., in *Neil* v. *Cheves,* 17 S. C. L. (1 Bailey) 539:

"If the rights of the parties were to be determined according to letter of the written contract, then the plaintiff must fail, because he was not himself at the place, ready to perform his part of the contract; and the same consequence must follow, if the parol agreement is substituted, for he failed to attend at the place and hour appointed by himself. I am well satisfied, however, that in legal strictness, the evidence was properly admitted, not as varying the written contract, or establishing a new and binding contract, but as a part of the circumstances, going to make up the proof, that the plaintiff was not ready to pay the money, and perform his part of the written agreement, all of which necessarily entered into the defense; and as an excuse for the defendant not having the cotton at the landing on February 1st. As I understand it, the plaintiff himself requested that the cotton should not be delivered until the 18th, and gave as a reason that he would not sooner be able to pay the money. Now to say that he could, by this means, be permitted to entitle himself to an action against the defendant, would be to allow him to avail himself of his own wrong, and profit by an act which was equivalent to a fraud."

We are mindful that this issue was not argued in the briefs; but it was argued at the bar, and it arises on the pleadings and the testimony, and the Circuit Court would have done wrong in the face of it to order a verdict for the defendant.

The judgment below is affirmed.